[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 12-14518
_____

D.C. Docket No. 9:07-cv-80758-DTKH


ERNEST CADET,

                                                        Petitioner-Appellant,

versus

STATE OF FLORIDA DEPARTMENT OF CORRECTIONS,

                                                        Respondent-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(January 31, 2014)

Before CARNES, Chief Judge, WILSON and FAY, Circuit Judges.

CARNES, Chief Judge:

      The Antiterrorism and Effective Death Penalty Act imposes a one-year

statute of limitations period for filing a federal habeas petition challenging a state

court judgment. 28 U.S.C. § 2244(d)(1). The limitations period is subject to equitable tolling. Holland v. Florida, — U.S. —, 130 S.Ct. 2549, 2560 (2010). Defining the circumstances that justify equitable tolling of that limitations period is a work in progress, the latest work on it having been done in two Supreme Court decisions. See Maples v. Thomas, — U.S. —, 132 S.Ct. 912 (2012); Holland, 130 S.Ct. 2549. This case requires us to determine the current test for equitable tolling of the § 2244(d) statute of limitations period, which requires interpreting what the Court said about it in those two decisions.

I.

In 2000, Ernest Cadet was convicted in Florida of sexual battery on a girl who was five years of age and simple battery, crimes for which he was sentenced to life imprisonment. His convictions were affirmed on direct appeal. See Cadet v. State, 809 So. 2d 43 (Fla. 4th DCA 2002), cert. denied, 828 So. 2d 384 (Fla. Sept. 23, 2002). The judgment of conviction became final 90 days later, on December 23, 2002, when the time for seeking a writ of certiorari from the United States Supreme Court expired. See McCloud v. Hooks, 560 F.3d 1223, 1227 (11th Cir. 2009). On that same date, Cadet's one-year statute of limitations for filing a federal habeas petition began to run. See 28 U.S.C. § 2244(d)(1).

On October 30, 2003 — 311 days after his convictions became final — Cadet filed a pro se state habeas petition, which statutorily tolled the federal

2

limitations period until January 22, 2004, the date his state habeas proceedings came to an end. See id. § 2244(d)(2) ("The time during which a properly filed application for State post-conviction or other collateral review . . . is pending shall not be counted toward any period of limitation under this subsection."). Another 49 days of untolled time elapsed until Cadet, on March 11, 2004, filed a pro se motion for post-conviction relief under Florida Rule of Criminal Procedure 3.850. Before Cadet filed that motion, attorney Michael Goodman, who had represented him on direct appeal, reviewed and edited it pro bono for Cadet. The Rule 3.850 motion suspended the running of the federal habeas limitations period but with only five days of it remaining.

After the State had received more than a year's worth of extensions to respond to Cadet's state post-conviction motion, Goodman filed a notice of appearance in the state trial court indicating that he would be representing Cadet during the remainder of the Rule 3.850 proceedings. The state trial court later denied Cadet's Rule 3.850 motion, and a Florida district court of appeal affirmed the denial on August 9, 2006. See Cadet v. State, 935 So. 2d 14 (Fla. 4th DCA 2006). That court's mandate issued on August 25, 2006, restarting the federal limitations period and giving Cadet until August 30, 2006, just five more days, to file a § 2254 petition. See Nyland v. Moore, 216 F.3d 1264, 1267 (11th Cir. 2000)

3

(holding that a Florida post-conviction motion remains pending until the appellate court's mandate issues).

During the pendency of the Rule 3.850 proceedings, Goodman and Cadet had at least five discussions about the limitations period for filing a federal habeas petition. In at least some of those discussions, based on what his fellow prisoners had said to him, Cadet told Goodman that he did not think that they had "much time" left to file a § 2254 petition. In response, Goodman mistakenly and repeatedly assured Cadet that they had one year from the resolution of his state post-conviction motion to file a federal petition. Goodman based those assurances on his own misreading of § 2244(d)(1). Reading the statutory provision is all that Goodman did to determine how to calculate the running of the limitations period. He did not research the matter.

After the state court of appeals' decision affirming the denial of his Rule 3.850 motion but before the mandate issued, Cadet became increasingly anxious about the federal limitations period and insisted that Goodman file a § 2254 petition "right away." Goodman reassured Cadet that he had one year from the end of his Rule 3.850 appeal to file a federal petition. Cadet "forcefully but respectfully" disagreed with Goodman's calculation of the filing deadline, explaining that "jailhouse lawyers" had advised him that he did not have much time left to a file a § 2254 petition and repeatedly asking Goodman, "Are you sure?

4

Are you sure?"  The jailhouse lawyers had not calculated a precise deadline for Cadet, and he believed that he had a few weeks left to file a § 2254 petition when he actually had only five days left after the mandate issued.  Again, Goodman assured Cadet that there was ample time to file a federal habeas petition, rhetorically asking him, "who are you going to believe, the real lawyer or the jailhouse lawyer?"  The majority of the conversations between Cadet and Goodman about the statute of limitations period occurred before the period ran out on August 30, 2006.

Goodman eventually put his advice in writing in a letter to Cadet dated September 29, 2006, one month after the limitations period had run out.  Goodman's letter, to which he attached copies of § 2244(d) and the Florida appellate court decision in Cadet's Rule 3.850 case, asserted:  "As you[] can see you have one year after the denial of your appeal to file for Habeas relief."  Cadet eventually accepted that advice because Goodman, unlike the jailhouse lawyers, was a real lawyer.

Goodman ultimately filed a § 2254 petition on Cadet's behalf on August 23, 2007.  That would have been timely with two days to spare had Goodman's understanding of the statute of limitations been correct.  But because his understanding was incorrect, the filing was almost a full year late; the limitations period had expired on August 30, 2006.  Cadet was ordered to show cause why his

5

federal habeas petition should not be dismissed as untimely.  Goodman responded that the petition was timely because it had been filed within one year of the issuance of the mandate by the Florida appellate court in the appeal from the denial of the state post-conviction motion.  The State responded that the petition was untimely and explained why.  That prompted Goodman to conduct some research, realize his mistake, and feel "horrendous."

Now conceding the untimeliness of the § 2254 petition, Goodman argued for equitable tolling of the federal limitations period based on the fact that he had miscalculated the filing deadline and repeatedly assured Cadet that it did not begin to run until after the denial of his state post-conviction motion.  Goodman was later discharged as counsel and a federal public defender was appointed to represent Cadet.  After an evidentiary hearing, a magistrate judge recommended that the district court conclude that equitable tolling applied, which would save Cadet's petition from being dismissed as untimely.  The magistrate judge found that Cadet had exercised due diligence in his efforts to timely file a § 2254 petition in light of the "undisputed facts" that he "repeatedly argued with Goodman about his calculation of the deadline and [he had insisted] that the petition be filed immediately."  The magistrate judge also concluded that while Goodman's initial misreading of the statute of limitations was "simple attorney error" that did not warrant equitable tolling, his failure to investigate further when confronted with

Cadet's doubts and his "hollow assurances" to Cadet that his calculation was correct amounted to "constructive abandonment," an extraordinary circumstance sufficient to merit relief.

The State objected to the magistrate judge's report and recommendation, contending that Goodman had not constructively abandoned Cadet because he had maintained regular contact with Cadet, had responded to his concerns about the filing deadline, and had not deliberately deceived him. The district court sustained the State's objections and dismissed Cadet's § 2254 petition as time-barred. While adopting the magistrate judge's factual findings and his legal conclusion that Cadet had exercised due diligence in pursuing his rights, the district court nevertheless determined that Goodman's conduct did not constitute an extraordinary circumstance sufficient to warrant equitable tolling because it was not "so egregious as to amount to an effective abandonment of the attorney-client relationship." The court reasoned that "counsel's error in failing to correctly calculate the deadline for filing the habeas petition" constituted an act of negligence "during the attorney-client relationship," not a constructive abandonment of that relationship.

Cadet appealed the dismissal of his federal habeas petition, and we granted him a certificate of appealability on the sole issue of "[w]hether the district court

7

improperly determined that [his] 28 U.S.C. § 2254 habeas petition was time-barred, based on its finding that he was not entitled to equitable tolling."

## II.

We review a district court's factual findings only for clear error, but that does not matter here because there are no disputed facts. We review de novo the court's application of equitable tolling law to the facts. Drew v. Dep't of Corr., 297 F.3d 1278, 1283 (11th Cir. 2002). In doing so, we keep in mind that equitable tolling is an extraordinary remedy "limited to rare and exceptional circumstances and typically applied sparingly." Hunter v. Ferrell, 587 F.3d 1304, 1308 (11th Cir. 2009) (quotation marks omitted). To warrant that extraordinary remedy, a petitioner must demonstrate "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way and prevented timely filing." Holland, 130 S.Ct. at 2562 (quotation marks omitted).

The State does not contest the district court's determination that Cadet diligently pursued his rights and, given his repeated questioning of counsel's calculation of the § 2254 deadline and his insistence that the petition be timely filed, we do not question that determination. See id. at 2565 ("The diligence required for equitable tolling purposes is reasonable diligence, not maximum feasible diligence.") (citations and quotation marks omitted); Downs v. McNeil, 520 F.3d 1311, 1322–23 (11th Cir. 2008) (petitioner exercised reasonable diligence

8

by writing multiple letters to counsel "to express concern over the running of the AEDPA filing period and to urge the filing of his federal habeas petition"). The dispositive question, then, is whether Goodman's actions in failing to timely file a § 2254 petition constitute an "extraordinary circumstance" for purposes of equitable tolling. To answer that question, we must first address the appropriate standard for gauging when attorney error amounts to an extraordinary circumstance, particularly in light of the Supreme Court's recent decision in Maples.

A.

Because a lawyer is the agent of his client, a federal habeas petitioner — who does not have a constitutional right to counsel — is ordinarily bound by his attorney's errors, including a miscalculation or misinterpretation of a filing deadline. See Lawrence v. Florida, 549 U.S. 327, 336–37, 127 S.Ct. 1079, 1085 (2007) ("Attorney miscalculation [of the federal limitations period] is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel."); see also Maples, 132 S.Ct. at 922 ("Negligence on the part of a prisoner's postconviction attorney does not qualify as 'cause' [for excusing a procedural default relating to a filing deadline] . . . because the attorney is the prisoner's agent, and under well-settled principles of agency law, the principal bears the risk of negligent conduct on the

9

part of his agent.") (citation and quotation marks omitted); Coleman v. Thompson, 501 U.S. 722, 753, 111 S.Ct. 2546, 2566–67 (1991) ("Attorney ignorance or inadvertence is not 'cause' [for excusing a procedural default relating to a filing deadline] because the attorney is the petitioner's agent when acting, or failing to act, in furtherance of the litigation, and the petitioner must bear the risk of attorney error.") (quotation marks omitted).  In recent years the Supreme Court has twice addressed the question of when, and under what limited circumstances, a petitioner does not bear the risk of his attorney's errors and may therefore be entitled to relief from a statute of limitations or procedural bar in spite of those errors.

In the first of those cases, Holland v. Florida, the Supreme Court rejected as "too rigid" this circuit's rule that even attorney conduct that is "grossly negligent" cannot justify equitable tolling of AEDPA's limitations period absent proof of "bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part."  130 S.Ct. at 2562–63 (quoting Holland v. Florida, 539 F.3d 1334, 1339 (11th Cir. 2008)).  The Court acknowledged that, under its own precedent, a petitioner ordinarily "must bear the risk of attorney error" and that a "garden variety claim of attorney negligence," such as a "simple miscalculation that leads a lawyer to miss a filing deadline, does not warrant equitable tolling."  Id. at 2563–64 (citation and quotation marks omitted).  It nevertheless held that, "at least sometimes, professional misconduct that fails to meet the Eleventh Circuit's

10

standard could nonetheless amount to egregious behavior and create an extraordinary circumstance that warrants equitable tolling." Id. at 2563.

The Supreme Court implied, but did not definitively hold, that counsel's conduct in the Holland case may have constituted an extraordinary circumstance because it involved "far more than 'garden variety' or 'excusable neglect.'" Id. at 2564. While counsel's failure to timely file a § 2254 petition and apparent ignorance of the correct filing deadline "suggest[ed] simple negligence," the Court emphasized four facts which might lead to the conclusion that counsel's conduct "amounted to more": (1) counsel's failure to file the petition on time "despite Holland's many letters that repeatedly emphasized the importance of his doing so"; (2) counsel's failure to "do the research necessary to find out the proper filing date, despite Holland's letters that went so far as to identify the applicable legal rules"; (3) counsel's failure to inform Holland that the Florida Supreme Court had affirmed the denial of his state post-conviction motion, "again despite Holland's many pleas for that information"; and (4) counsel's failure to communicate with Holland during the two-year period in which his state motion was pending before the Florida Supreme Court, "despite various pleas from Holland that [counsel] respond to his letters." Id. at 2564; see also id. at 2555.

There was more. During his state post-conviction proceedings, Holland had unsuccessfully sought to discharge his attorney, complaining to the Florida

Supreme Court that there had been "a complete breakdown in communication," that counsel had "not kept him updated on the status of his capital case," and that counsel had "abandoned" him. Id. at 2555 (quotation marks and brackets omitted). The state supreme court had denied Holland's attempts to get rid of his attorney. Even with all of that, including the "serious instances of attorney misconduct," the Supreme Court declined to state its "conclusion in absolute form," and remanded the case for a determination of whether the circumstances involved "indeed constitute extraordinary circumstances sufficient to warrant equitable relief." Id. at 2564–65.

In his concurring opinion in Holland, which set the template for the Supreme Court's later decision in Maples, Justice Alito chided the majority for failing to adequately explain when attorney misconduct rises to the level of an "extraordinary circumstance," and he criticized the apparent distinction drawn by the majority between ordinary and gross negligence as "impractical," "highly artificial," and "hard to administer." Id. at 2566–68 (Alito, J., concurring). Justice Alito argued that the relevant distinction should be between all forms of attorney negligence, "however styled," which would be "constructively attributable to the client," and "attorney misconduct that is not constructively attributable to the petitioner" because counsel had "essentially abandoned" the client. Id. at 2567–68 (quotation marks omitted). In Justice Alito's view, the petitioner in Holland might

12

well be entitled to equitable tolling, not because his attorney had acted with gross negligence, but because counsel had effectively abandoned him, "as evidenced by counsel's near-total failure to communicate with petitioner or to respond to petitioner's many inquiries and requests over a period of several years." Id. at 2568. "Common sense," Justice Alito concluded, "dictates that a litigant cannot be held constructively responsible for the conduct of an attorney who is not operating as his agent in any meaningful sense of the word." Id.

Two years later in Maples v. Thomas, the Supreme Court revisited the question of when attorney misconduct might rise to the level of "extraordinary circumstances beyond a [petitioner's] control," albeit in the context of what it takes to establish cause to excuse a state procedural bar to federal habeas relief. 132 S.Ct. at 924. The petitioner in Maples was an Alabama death-row inmate who had been represented by two pro bono attorneys from a New York law firm and a local attorney recruited for the sole purpose of allowing the out-of-state attorneys to be admitted pro hac vice. Id. at 918–19. While Maples' state post-conviction petition was pending, the two New York attorneys left their firm for positions that rendered them ineligible to continue to represent him. Id. at 919, 924. Neither attorney, however, notified Maples of his departure and resulting inability to represent Maples. Id. at 919. Nor did either of them ask the state trial court for leave to withdraw or move for substitution of counsel. Id. Without the assistance of his

13

listed attorneys of record, Maples did not receive timely notice of the denial of his state post-conviction petition and, as a result, failed to timely appeal that ruling, which led to the procedural default of his claims in federal court. Id. at 920–21.

In its discussion in Maples, the Supreme Court reaffirmed the general rule that, "under well-settled principles of agency law," a petitioner "bears the risk of negligent conduct on the part of his [attorney]" and, for that reason, is ordinarily bound by counsel's failure to meet a filing deadline. Id. at 922 (quotation marks omitted). The Court held, however, that "[a] markedly different situation is presented . . . when an attorney abandons his client without notice" and thereby "sever[s] the principal-agent relationship," at which point counsel's "acts or omissions . . . cannot fairly be attributed to the client." Id. at 922–23 (quotation marks and brackets omitted). The Court agreed with, and adopted, Justice Alito's view that "under agency principles, a client cannot be charged with the acts or omissions of an attorney who has abandoned him," and emphasized that Justice Alito's Holland concurrence had "homed in on the essential difference between a claim of attorney error, however egregious, and a claim that an attorney had essentially abandoned his client." Id. at 923–24 (emphasis added). Underscoring that "essential difference," the Court also cast — or recast, as the case may be — its Holland decision as turning on counsel's "abandonment" of his client, instead of on counsel's gross negligence, and the Court clarified that it saw "no reason . . .

14

why the distinction between attorney negligence and attorney abandonment should not hold in both" the equitable tolling and procedural default contexts.  Id. at 923 & n.7 (quotation marks omitted) (emphasis added).

Having laid down the doctrinal framework for determining when attorney error is not constructively attributable to a petitioner, the Supreme Court then analyzed whether "Maples ha[d] shown that his attorneys of record abandoned him, thereby supplying the 'extraordinary circumstances beyond his control' necessary to lift the state procedural bar to his federal petition."  Id. at 924.  The Court concluded that counsel had abandoned Maples because, as a matter of both common sense and agency law principles, he was effectively "left without any functioning attorney of record" and had "been reduced to pro se status."  Id. at 927.

Cadet acted with reasonable diligence, and we assume for present purposes that Goodman's sincere but stubborn misreading of § 2244(d) amounted to gross negligence.  The resulting question is whether attorney error that amounts to gross negligence is a sufficiently extraordinary circumstance for equitable tolling purposes, as the majority opinion in Holland seems to suggest, or whether the attorney's conduct must amount to an abandonment of the attorney-client relationship, as Maples does state.

The Supreme Court in Holland did not actually decide whether Holland himself was entitled to equitable tolling.  130 S.Ct. at 2565.  Still, the majority

15

opinion in that case, read by itself, could be interpreted to mean that attorney misconduct amounting to more than "garden variety" negligence, but falling short of abandonment, may warrant equitable tolling. The <u>Holland</u> opinion, however, cannot be read by itself. Instead, that opinion must be read in light of the Court's explanation of <u>Holland</u> eighteen months later in its <u>Maples</u> decision. In <u>Maples</u> the Court pointed out that the petitioner in <u>Holland</u> had "urged that attorney negligence was not the gravamen of his complaint. Rather, he asserted that his lawyer had detached himself from any trust relationship with [him] . . . [and had] abandoned [him] . . . ." <u>Maples</u>, 132 S.Ct. at 923 (quotation marks omitted). The <u>Maples</u> Court characterized <u>Holland</u> as a case of attorney abandonment, not one of gross negligence, emphasizing that it involved "counsel's near-total failure to communicate with petitioner or to respond to petitioner's many inquiries and requests over a period of several years." <u>Id.</u> (quoting <u>Holland</u>, 130 S.Ct. at 2568 (Alito, J., concurring)). In the course of doing so, the Court reached back to Justice Alito's concurring opinion in <u>Holland</u> and adopted its distinction between attorney negligence, however styled and however egregious, on the one hand, and attorney abandonment on the other. <u>See id.</u> at 923 & n.7. And the Court stated that the critical distinction between any kind of negligence and abandonment applies in both the equitable tolling and procedural default contexts.[1] <u>Id.</u>

---

[1] Our concurring colleague believes that we have misinterpreted the <u>Maples</u> Court

The Supreme Court explained in <u>Maples</u> that the critical distinction between attorney negligence and attorney abandonment is grounded in "well-settled principles of agency law," under which a petitioner bears the risk of attorney error unless his attorney has essentially abandoned him and thereby "severed the principal-agent relationship." <u>Id.</u> at 922–23. The Court reiterated the rule that a petitioner is bound by his attorney's mistake in missing a filing deadline ("We do not disturb that general rule"), but held that "[a] markedly different situation" exists when "an attorney abandons his client without notice, and thereby occasions the default." <u>Id.</u> at 922. The client is not responsible for what happens after his attorney abandons him.

In light of the Supreme Court's <u>Maples</u> decision, we hold that attorney negligence, however gross or egregious, does not qualify as an "extraordinary

statement that it saw "no reason . . . why the distinction between attorney negligence and attorney abandonment should not hold in both" the procedural default and equitable tolling contexts, and that the most reasonable interpretation of that statement is that <u>Maples</u> was simply reaffirming the notion that simple negligence, as opposed to gross negligence, is never sufficient to warrant equitable tolling. That view fails to come to grips with the context in which the statement was made. The context is that the Court in <u>Maples</u> adopted the distinction drawn by Justice Alito in his <u>Holland</u> concurrence between all forms of attorney negligence, including gross negligence, and abandonment, and explained that it was doing so because Justice Alito had "homed in on <u>the essential difference between</u> a claim of <u>attorney error, however egregious</u>, and a claim that an attorney had essentially <u>abandoned his client</u>." <u>Maples</u>, 132 S.Ct. at 923 (emphasis added). It is the Supreme Court that has insisted that "the essential difference" is not between simple negligence and egregious negligence, but instead, between negligence "however egregious" and abandonment. That is, after all, exactly what the Court said. We believe that the most reasonable interpretation of the Court's statement, as well as the context in which it was made (adopting Justice Alito's position in <u>Holland</u>), is that the Supreme Court meant "the essential difference" is exactly what the Court said the essential difference is.

17

circumstance" for purposes of equitable tolling; abandonment of the attorney-client relationship, such as may have occurred in Holland, is required.[2] Applying that standard to this case, our inquiry is whether Cadet "has shown that his attorney . . . abandoned him, thereby supplying the 'extraordinary circumstances'" necessary to warrant equitable tolling of the § 2244(d) statute of limitations period. See id. at 924.

## B.

Cadet contends that Goodman effectively abandoned him, thereby severing the attorney-client relationship, by failing to follow Cadet's instructions to file a § 2254 petition on time, by repeatedly reassuring Cadet that Goodman's understanding of the federal filing deadline was correct and that of the jailhouse lawyers was incorrect, and by not conducting any legal research to determine the proper filing date when Cadet expressed doubts. Cadet argues that, under agency law principles, counsel effectively abandons his client and severs the attorney-client relationship when he acts in a manner that harms his client's interests. As

---

[2] The concurrence suggests that adopting an abandonment standard, which we believe is compelled by the Supreme Court's decision in Maples, contravenes Holland's rejection of rigid, mechanical, per se rules in the equitable tolling context. See Holland, 130 S.Ct. at 2563 (explaining that equity demands "flexibility" and the avoidance of "mechanical" and "rigid rules"). Holland, of course, itself adopted a rigid per se rule that simple or garden variety negligence can never warrant equitable tolling. See id. at 2564. Requiring a showing of abandonment no more entails a rigid per se approach than requiring a showing of gross negligence does. We have not adopted a rigid or mechanical definition of attorney abandonment, and contrary to our colleague's suggestion, nothing in our opinion forecloses courts from engaging in "equitable, case-by-case" inquiries into whether the requisite abandonment occurred, provided, of course, that egregious negligence is not equated with abandonment.

18

the discussion in Maples shows, agency law does provide the principles that govern a client's accountability for his attorney's errors, but Cadet misstates those principles.

Under fundamental principles of agency law, the agency relationship between an attorney and his client can be severed, with the result that the client is not constructively charged with his attorney's knowledge or actions, where counsel acts adversely to his client's interests or commits a serious breach of loyalty to his client. See Restatement (Second) of Agency § 112 (1958) ("[T]he authority of an agent terminates if, without knowledge of the principal, he acquires adverse interests or if he is otherwise guilty of a serious breach of loyalty to the principal."); Restatement (Third) of Agency § 5.04 (2006) ("[N]otice of a fact that an agent knows or has reason to know is not imputed to the principal if the agent acts adversely to the principal in a transaction or matter . . . ."); Downs, 520 F.3d at 1320 ("[U]nder fundamental tenets of agency law, a principal is not charged with an agent's actions or knowledge when the agent is acting adversely to the principal's interests."). The adverse interest exception to the general rule of constructive imputation, however, is not nearly as broad as Cadet suggests.

For purposes of agency law, an agent is not deemed to have acted adversely to his principal's interests simply because he made an unwise or negligent or grossly negligent mistake that harmed those interests. Instead, an agent is deemed

19

to have acted adversely to his principal's interests only when he acts for the purpose of advancing his own interests or those of another person. The Restatements (both Second and Third) of Agency make that clear. The Third Restatement provides that a principal is not charged with his agent's knowledge "if the agent acts adversely to the principal in a transaction or matter, intending to act solely for the agent's own purposes or those of another person." Restatement (Third) § 5.04 (emphasis added). It also provides: "[T]he fact that an action taken by an agent has unfavorable results for the principal does not establish that the agent acted adversely." Id., cmt. c. The Second Restatement similarly provides: "A principal is not affected by the knowledge of an agent in a transaction in which the agent secretly is acting adversely to the principal and entirely for his own or another's purposes . . . ." Restatement (Second) § 282 (emphasis added). As the First Circuit has explained: "'Adverse interest' in the context of imputation means that the [agent] is motivated by a desire to serve himself or a third party, and not the [principal], the classic example being looting." Baena v. KPMG LLP, 453 F.3d 1, 8 (1st Cir. 2006).

The theory behind the adverse interest exception is that "where an agent, though ostensibly acting in the business of the principal, is really committing a fraud for his own benefit, he is acting outside the scope of his agency, and it would therefore be most unjust to charge the principal with knowledge of it." Wight v.

20

BankAmerica Corp., 219 F.3d 79, 87 (2d Cir. 2000) (quotation marks omitted). Courts have recognized that the adverse interest exception is a narrow one, which applies only where an agent wholly disregards the principal's interests in favor of his own interests or the interests of a third party. See id. ("The adverse interest exception, however, is narrow and applies only when the agent has 'totally abandoned' the principal's interests."); Beck v. Deloitte & Touche, 144 F.3d 732, 736 (11th Cir. 1998) (explaining that, under Florida law, an agent's actions must be "entirely adverse" to the principal's interests, meaning that "his actions must neither be intended to benefit the [principal] nor actually cause short- or long-term benefit to the [principal]"); see also Towery v. Ryan, 673 F.3d 933, 942 (9th Cir. 2012) (holding that counsel's failure to raise a colorable habeas claim did not amount to "severance of [the] attorney-client relationship" because the record did not suggest that counsel "permitted any interest or consideration to interfere with his loyalty to [the petitioner]").

It has to be so. If, as Cadet argues, a principal were not held responsible for his agent's action or inaction whenever the effect of it was adverse to the principal's interests, he would never be accountable for his agent's conduct except when it benefited him. Any mistake, oversight, or negligence of the agent that adversely affected the principal's interests would not be charged against the principal no matter how loyal or devoted to the principal's interests the agent was.

21

That is not how the legal regime of agency operates.  There is no upside only slant to it.  If there were — if Cadet's position prevailed — instead of there being a narrow adverse interest exception, there would be a broad adverse impact exception that would eviscerate the general rule that the principal is responsible for the actions of his agent.  Agency law would be turned upside down, and no one would be willing to deal with a principal through his agent.

Goodman's misinterpretation of the filing deadline and failure to conduct any research into the matter, particularly when faced with Cadet's persistent challenges to his calculation, was certainly negligent and, we assume, grossly so.  A careful reading of § 2244(d) should have dispelled Goodman's mistaken belief that the limitations period did not begin to run until after the conclusion of Cadet's Rule 3.850 proceedings.  See 28 U.S.C. § 2244(d)(1)(A) (providing that the one-year limitations period runs from the "conclusion of direct review or the expiration of the time for seeking such review") (emphasis added).  But the fact that Goodman ought to have known better or ought to have done the necessary research to know better does not mean that he was "acting adversely" to Cadet's interests as that phrase is used in agency law.  Cf. Hutchinson v. Florida, 677 F.3d 1097, 1100 (11th Cir. 2012) (explaining that counsel's misinterpretation of AEDPA does not warrant equitable tolling simply because counsel "ought to have known better").  However much his negligence harmed Cadet's interests, that negligence and harm

did not occur because Goodman was acting to promote his own or a third party's interests at the expense of Cadet's interests.  To disregard that critical fact, as Cadet would have us do, would ignore the "essential difference" the Supreme Court emphasized in Maples between attorney errors, which are attributable to a client even though harmful, and defaults that occur as a result of attorney abandonment, which are not attributable to a client.  See Maples, 132 S.Ct. at 923.

Goodman's negligence in missing the filing deadline does not mean that he abandoned or effectively abandoned Cadet.  Negligence, however gross, is not the same as abandonment.  If it were, there would be no point in Maples' refinement or explication of what Holland said.  Abandonment, which Maples made the standard, denotes absolute renunciation or withdrawal, or a complete rejection or desertion of one's responsibilities, a walking away from a relationship.  See Black's Law Dictionary 2 (6th ed. 1990) (defining "abandon" as "[t]o give up absolutely; to forsake entirely; to renounce utterly; to relinquish all connection with or concern in; to desert"); Random House Webster's Unabridged Dictionary 2 (2d ed. 2001) (defining "abandon" as "to leave completely and finally; forsake utterly; desert," or "to give up; discontinue, withdraw from"); Webster's New World College Dictionary 1 (3d ed. 1991) (defining "abandon" as "to give up (something) completely or forever" and explaining that it "implies leaving a person or thing, either as a final, necessary measure . . . or as a complete rejection of one's

23

responsibilities, claims, etc."); see also Harris v. United States, 367 F.3d 74, 81 (2d Cir. 2004) (equating "abandonment" with "physical disappearance or constructive disappearance") (citations omitted); State v. Bradley, 811 S.W.2d 379, 384 (Mo. 1991) (defining "abandonment" as conduct that amounts to "a total default in carrying out the obligations imposed upon [] counsel," not merely ineffective assistance).

Goodman did not withdraw from representing Cadet, renounce his role as counsel, utterly shirk all of his professional responsibilities, or walk away from their attorney-client relationship. Unlike the lawyer in Holland, Goodman did not fail to keep his client abreast of key developments in his case, did not ignore his client's inquires or concerns, and did not sever nearly all communication with his client for a period of years — or even for months or even for weeks. See Holland, 130 S.Ct. at 2564 (counsel, among other deficiencies, "failed to inform Holland in a timely manner about the crucial fact that the Florida Supreme Court had decided his case, [] despite Holland's many pleas for that information," and "failed to communicate with his client over a period of years, despite various pleas from Holland that [counsel] respond to his letters"); Maples, 132 S.Ct. at 923 (characterizing Holland as a case of abandonment involving "counsel's near-total failure to communicate with petitioner or to respond to petitioner's many inquiries and requests over a period of several years") (quotation marks omitted). And

24

unlike the lawyers in <u>Maples</u>, Goodman did not wholly desert, forsake, or abandon his client without notice, thereby ceasing to serve as his agent "in any meaningful sense of that word" and leaving him "without any functioning attorney of record." See <u>Maples</u>, 132 S.Ct. at 924–97.  Instead, Goodman maintained regular contact with Cadet throughout his state post-conviction proceedings; responded to all of his many inquiries and concerns about the federal filing deadline; sent him copies of the relevant statutory language and state appellate court opinion; and prepared and eventually filed a § 2254 petition on his behalf.

Although Goodman did fail to file that § 2254 petition on time, he did not willfully disregard Cadet's instructions that he do so.  Based on his misreading of § 2244(d), Goodman genuinely believed that he had ample time in which to prepare and file a federal habeas petition following the conclusion of Cadet's Rule 3.850 proceedings.  As Justice Alito noted in his <u>Holland</u> concurrence, articulating the critical distinction that would become the <u>Maples</u> standard, an attorney's miscalculation of the filing deadline, inadvertent failure to file a § 2254 petition on time, or failure "to do the requisite research to determine the applicable deadline" are all types of errors that are "constructively attributable to the client."  <u>Holland</u>, 130 S.Ct. at 2567 (Alito, J., concurring).

And Goodman's negligent misreading of § 2244(d)(1)(A) is the kind of attorney error regarding the § 2244(d) statute of limitations provisions that the

Supreme Court, this Court, and other courts have held do not qualify as an extraordinary circumstance warranting equitable tolling. See Lawrence, 549 U.S. at 336–37, 127 S.Ct. at 1085 (equitable tolling not warranted where the petitioner's attorneys miscalculated the § 2244(d) filing deadline because they were unaware of well-settled law; to hold otherwise "would essentially equitably toll limitations periods for every person whose attorney missed a deadline. Attorney miscalculation is simply not sufficient to warrant equitable tolling"); Steed v. Head, 219 F.3d 1298, 1300 (11th Cir. 2000) ("Any miscalculation or misinterpretation by Steed's attorney in interpreting the plain language of [§ 2244(d)] does not constitute an extraordinary circumstance sufficient to warrant equitable tolling."); Johnson v. Hendricks, 314 F.3d 159, 162–63 (3d Cir. 2002) (equitable tolling not warranted where the petitioner detrimentally relied on counsel's erroneous advice that under § 2244(d) he had one year from the conclusion of his state post-conviction proceedings to file a § 2254 petition); Harris v. Hutchinson, 209 F.3d 325, 331 (4th Cir. 2000) (counsel's misinterpretation of the "unambiguously" clear § 2244(d)(1) provision did not constitute an extraordinary circumstance); Tailiani v. Chrans, 189 F.3d 597, 597–98 (7th Cir. 1999) (concluding that "under no tenable view of the doctrine [of equitable tolling] did the lawyer's mistake" in calculating the filing deadline because of inadequate research into § 2244(d)(1) warrant tolling). Those decisions

26

all preceded the <u>Holland</u> and <u>Maples</u> decisions, but they are not inconsistent with either decision.

Of course, when Cadet repeatedly expressed concern and informed Goodman that jailhouse lawyers had calculated his filing deadline differently, Goodman stubbornly but in good faith adhered to his misreading of the statutory provision. But stubborn negligence is still negligence, not abandonment. Persisting in a mistaken reading of a statutory provision after being told that non-lawyers have questioned that reading may be enough to raise the degree of a lawyer's negligence to the level of gross negligence, but it is not abandonment. The difference between negligence and abandonment is one of kind, not of degree.

Because Cadet was not abandoned by his post-conviction attorney, he has failed to establish the "extraordinary circumstances" necessary to warrant equitable tolling of the § 2244(d) limitations period. We therefore affirm the district court's dismissal of his § 2254 petition as time-barred.

**AFFIRMED.**

WILSON, Circuit Judge, concurring:

Although I concur in the result, I write separately to explain my understanding that Supreme Court precedent does not require abandonment for a habeas petitioner to successfully assert equitable tolling of a federal time bar.

*Holland v. Florida* rejected this court's "too rigid" rule limiting the circumstances that could be considered sufficiently extraordinary to warrant equitable tolling. 560 U.S. 631, __, 130 S. Ct. 2549, 2563–64 (2010). It is clear from that opinion that actual abandonment is not required. *See id.* at __, 130 S. Ct. at 2562–63 (rejecting our previously articulated rule that "conduct that is 'grossly negligent' can never warrant tolling absent 'bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part'" (quoting *Holland v. Florida*, 539 F.3d 1334, 1339 (11th Cir. 2008) (per curiam), *rev'd*, 560 U.S. at __, 130 S. Ct. at 2565)). At the same time, the Court's opinion does not set forth a clearly discernible standard which we may use to determine whether a petitioner has demonstrated "that some extraordinary circumstance stood in his way." *See id.* at __, 130 S. Ct. at 2562–63 (internal quotation marks omitted). But rejecting a per se rule is exactly what the Court intended. In fact, the Court noted that one of the aims of equity—and thus, equitable tolling—is "to relieve hardships which, from time to time, arise from *a hard and fast adherence to more absolute legal rules, which, if strictly applied, threaten the evils of archaic rigidity*." *Id.* at __, 130 S.

28

Ct. at 2563 (emphasis added) (internal quotation marks omitted); *see also*

*Hutchinson v. Florida*, 677 F.3d 1097, 1098 (11th Cir.), *cert. denied*, __ U.S. __,

133 S. Ct. 435 (2012) (Carnes, J.) ("Equitable tolling is, well, equitable in nature . .

. ."). Therefore, rather than relying on a mechanical approach to equitable tolling,

we must follow the command of the Supreme Court and "exercise judgment in

light of prior precedent, but with awareness of the fact that specific circumstances,

often hard to predict in advance, could warrant special treatment in an appropriate

case." *Holland*, 560 U.S. at __, 130 S. Ct. at 2563.

Despite the majority's assessment to the contrary, *Maples v. Thomas*, __

U.S. __, 132 S. Ct. 912, did not "recast" *Holland*'s holding. Maples argued that

his attorneys had abandoned him, thereby severing the attorney-client relationship

and negating any imputation of his attorneys' conduct to him. *See generally* Brief

for Petitioner at 35–52, *Maples*, __ U.S. __, 132 S. Ct. 912 (No. 10-63). He did

not argue, and the Court did not consider, whether misconduct falling short of

abandonment would be sufficient to excuse his default. Moreover, the Court

rendered such a discussion superfluous because it held that Maples's "counsel of

record abandoned him." *Id.* at __, 132 S. Ct. at 927. Therefore, the standard for

equitable tolling set forth in *Holland*—that conduct by counsel must be considered

on a case-by-case basis under principles of equity—was not disturbed.

Even if *Maples* could be read to foreclose any inquiry into counsel misconduct whenever it falls short of abandonment, that case involved procedural default for failure to meet a *state* filing deadline.  __ U.S. at __, 132 S. Ct. at 917. Here, and in *Holland*, the petitioners failed to meet a *federal* filing deadline.  560 U.S. at __, 130 S. Ct. at 2554–55.  The Court made clear in *Holland* that, even if abandonment is necessary to excuse a state procedural default, misconduct falling short of abandonment can warrant equitable tolling where a petitioner misses a federal deadline.  *Id.* at __, 130 S. Ct. at 2563 ("We recognize that, in the context of procedural default, we have previously stated, without qualification, that a petitioner must bear the risk of attorney error.  But *Coleman*[1] was a case about federalism in that it asked whether *federal* courts may excuse a petitioner's failure to comply with a *state court's* procedural rules, notwithstanding the state court's determination that its own rules had been violated.  Equitable tolling, by contrast, asks whether federal courts may excuse a petitioner's failure to comply with *federal* timing rules, an inquiry that does not implicate a state court's interpretation of state law."  (citations and internal quotation marks omitted)).  The Court thus expressly distinguished equitable tolling from state procedural default.[2]  It then

---

[1] *Coleman v. Thompson*, 501 U.S. 722, 111 S. Ct. 2546 (1991).

[2] The Court also made clear in *Coleman* that the reasons for the high degree of deference to a state court's dismissal of a state proceeding due to procedural default are "comity and federalism."  501 U.S. at 730, 111 S. Ct. at 2554.  Specifically, "the States should have the first opportunity to address and correct alleged violations of state prisoner's [sic] federal rights," and ignoring a state procedural default would "deprive[] the state courts of an opportunity to address

went on to reject any rigid rule regarding when "extraordinary circumstances" sufficient to warrant equitable tolling exist, opting instead for an equitable approach based on the circumstances of each case. *See id.* at __, 130 S. Ct. at 2563–64.

Nothing in *Maples* suggests that the Court abandoned this distinction. The majority misconstrues the Court's statement in a footnote that it saw "no reason, however, why the distinction between attorney negligence and attorney abandonment should not hold in both contexts." *Maples*, __ U.S. at __, 132 S. Ct. at 923 n.7. The most reasonable interpretation of that statement is that the attorney negligence to which it refers is simple negligence that would not entitle a petitioner to relief in either the equitable tolling or the procedural default context. The footnote does not, however, address more egregious examples of attorney misconduct that do not constitute abandonment yet may warrant equitable tolling under *Holland*. The reason for this is straightforward: the Court was presented only with an attorney abandonment claim, and it wanted to clarify its holding that abandonment constitutes extraordinary circumstances in both the procedural default and equitable tolling contexts (and conversely that simple attorney negligence would not suffice in either event). The statement, then, does not rule

---

those claims in the first instance." *Id.* at 731–32, 111 S. Ct. at 2555. These concerns are not present when a federal deadline is missed.

out the possibility that attorney misconduct which does not rise to the level of abandonment *might* constitute extraordinary circumstances sufficient to warrant equitable tolling.

Therefore, reading *Maples*, *Holland*, and *Coleman* together makes clear that, at least in the equitable tolling context, nothing forecloses the equitable, case-by-case inquiry that permits us to find extraordinary circumstances in the absence of attorney abandonment.  Consequently, we are still bound by *Holland*'s command that we reject any "mechanical rules" and "meet new situations that demand equitable intervention, and . . . accord all the relief necessary to correct particular injustices."  560 U.S. at __, 130 S. Ct. at 2563 (internal quotation marks omitted).

32