[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 16-12154
Non-Argument Calendar
_____

D.C. Docket No. 1:15-cr-20529-JAL-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

BERSON MARIUS,
a.k.a. Sasha,
a.k.a. Sha,

Defendant-Appellant

_____

Appeal from the United States District Court
for the Southern District of Florida
_____

(February 6, 2017)

Before WILLIAM PRYOR, MARTIN and ANDERSON, Circuit Judges.

PER CURIAM:

Berson Marius appeals his sentence of 200 months of imprisonment for conspiring to possess with intent to distribute a controlled substance. 21 U.S.C. §§ 841(a)(1), 846. Marius challenges the amount of drugs attributed to him and the enhancement of his sentence for possessing a firearm, for maintaining a premises to distribute drugs, and for his role as a leader of the conspiracy. Marius also challenges the use of two prior convictions in the Florida courts to classify him as a career offender under the Sentencing Guidelines. We affirm.

The district court did not clearly err by attributing to Marius 120 grams of cocaine base and of powder cocaine. In his factual proffer, Marius admitted that he "directed the sale of narcotics" from a house located at 1160 NW 141 Street in Miami; he was "responsible for distributing" cocaine base, powder cocaine, Ethylone, Alprazolam, heroin, and marijuana; he dictated the price of and managed the volume of drugs sold from the house; he and his coconspirators "relocate[d] their primary narcotics distribution activities to a[nother] residence" at 810 N.W. 145 Street in Miami; he sold drugs at both houses; he packaged cocaine; and he delivered drugs to both houses and collected the sales proceeds "nearly every day." The district court reasonably determined from Marius's involvement and oversight that he was responsible for the drugs he sold and those sold by his coconspirators. *See* United States Sentencing Guidelines Manual § 1B1.3(a)(1)(B) (Nov. 2015); *United States v. Ismond*, 993 F.2d 1498, 1499 (11th Cir. 1993). Marius admitted

2

that, between August 2014 and May 2015, he sold more than 150 grams of cocaine base and powder and that ledgers maintained by the conspiracy recorded sales of more than $25,000 of drugs between February 17, 2015, and April 9, 2015. The ledgers reflected that the two drug houses were used to distribute six types of drugs and operated virtually every day and at all hours, yet the government calculated Marius's drug quantity based on the sales of two drugs for 5 days a week over a 12-week span. Based on evidence about multiple daily shifts at each house and ledger entries describing the quantity of each drug sold and corresponding sales proceeds, the government estimated that each house sold 2 grams of cocaine base and of cocaine powder per day. That was a fair and conservative estimate on which the district court was entitled to rely in determining what amount of drugs to attribute to Marius. *See United States v. Almedina*, 686 F.3d 1312, 1315–16 (11th Cir. 2012). Ample evidence supported the drug quantity used by the district court to calculate Marius's sentence.

The district court did not clearly err by enhancing Marius's offense level by two levels for possessing firearms. *See* U.S.S.G. § 2D1.1(b)(1). Marius admitted to a transaction on June 17, 2014, during which "narcotics packages for distribution [were] visible next to firearms" inside the house on 141 Street where he "directed the sale of narcotics"; having three firearms seized from the house on July 8, 2014; receiving a telephone call on April 9, 2015, in which a coconspirator reported

3

fleeing the house "with . . . drugs and guns"; and that two coconspirators were "armed with firearms to defend" the house on April 29, 2015. Marius also admitted that he had "a 7.62 caliber AK-style assault rifle in a bedroom" in his home along with "a scale and small quantities of cocaine" and "ammunition of various calibers" and that a Ruger Mini-14 rifle seized from a coconspirator's residence was "the same rifle that was regularly used to 'serve and protect' the [drug] houses." And Special Agent Brendan Collins testified that the Federal Bureau of Investigation intercepted telephone calls between the coconspirators about relocating firearms ostensibly to protect themselves and the drug houses and that Marius sold drugs outside his residence where agents discovered the assault rifle. Because the government proved that there were firearms in proximity to drug trafficking by Marius and his coconspirators, the burden shifted to Marius to establish that it was "clearly improbable" that the firearms were used in connection with his offense. *See United States v. Stallings*, 463 F.3d 1218, 1220 (11th Cir. 2006). The district court reasonably determined that the evidence negated Marius's arguments that the firearms were unrelated to the drug trafficking.

The district court also did not clearly err by enhancing Marius's offense level for maintaining a house to distribute drugs.  *See* U.S.S.G. § 2D1.1(b)(12). Marius admitted that he used the house on 141 Street to sell drugs and that he controlled the drug transactions conducted on, the quantity of drugs available at,

4

and the retrieval of proceeds from the house. *See id.* cmt. n.17. Evidence also established that Marius was responsible for repairing the house. *See id.* Agent Collins testified about telephone calls in which Marius referred to the house as "his crib" and he discussed replacing doors damaged during the execution of a search warrant and installing cameras at the house. The district court reasonably determined that Marius maintained the house at 141 Street for drug trafficking.

Ample evidence also supported the decision to increase Marius's offense level for his role as a leader of the conspiracy. *See id.* § 3B1.1(a). Marius exercised extensive decision-making authority over the price of the drugs and the payment of sellers; he supervised the workers at the house on 141 Street; and he orchestrated the movement of drugs and cash to and from the drug houses. *See United States v. Ramirez*, 426 F.3d 1344, 1355 (11th Cir. 2005). The ledgers and intercepted telephone calls also revealed that Marius shared the majority of the drug proceeds with his brother and he spearheaded the distribution of cocaine base while his brother organized the trafficking in powder cocaine. Although Agent Collins testified that Marius "shared the leadership role" with his brother, Marius did "not have to be the sole leader or kingpin of the conspiracy in order to be considered an organizer or leader within the meaning of the Guidelines," *id.* (internal quotation marks, alterations, and citation omitted). The district court did not clearly err in finding that Marius led the conspiracy.

The district court did not err by counting Marius's prior convictions in the Florida courts as predicate offenses and classifying him as a career offender. *See* U.S.S.G. § 4B1.2(a)(1). In 1999, Marius pleaded guilty to armed carjacking and armed robbery. That Marius was adjudicated a youthful offender had no effect on using the carjacking and robbery convictions as predicate offenses because he was convicted in an adult court and sentenced to serve two years in the custody of the Department of Corrections. *See United States v. Wilks*, 464 F.3d 1240, 1242–43 (11th Cir. 2006). Marius argues that his 1998 convictions did not qualify as crimes of violence, but we held in *United States v. Fritts*, 841 F.3d 937 (11th Cir. 2016), that a "Florida armed robbery conviction under [section] 812.13 categorically qualifies as a 'violent felony' under the ACCA's elements clause," *id.* at 944, and the elements of the carjacking statute "mirror" those in the robbery statute, *Cruller v. State*, 808 So. 2d 201, 204 (Fla. 2002). *See Spencer v. United States*, 773 F.3d 1132, 1171 (11th Cir. 2014) ("[O]ur determinations about whether a conviction constitutes a 'violent felony' under the ACCA apply to the analysis of whether an offense qualifies as a 'crime of violence' under the Sentencing Guidelines."). And Marius's conviction in 2009 for resisting an officer with violence qualifies as a crime of violence under the elements clause of the Guidelines. *See United States v. Romo-Villalobos*, 674 F.3d 1246, 1248–51 (11th Cir. 2012). It is of no moment that the Florida court withheld adjudication. Under the Sentencing Guidelines, "[a]

diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding is counted as a sentence under [section] 4A1.1(c) even if a conviction is not formally entered." U.S.S.G. § 4A1.2(f). That determination is not affected by our holding in *United States v. Clarke*, 822 F.3d 1213 (11th Cir. 2016), that a guilty plea with adjudication withheld is not a "conviction" under Florida law for the purpose of being a felon in possession of a firearm, 18 U.S.C. § 922(g)(1). The district court correctly treated Marius as a career offender in determining his criminal history category.

We **AFFIRM** Marius's sentence.